## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **CLIFFORD D. SKEEN,** | ) | |
| Plaintiff | ) | |
| | ) | |
| | ) | Civil Action No. 2:14cv00036 |
| | ) | **MEMORANDUM OPINION** |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of Social Security,** | ) | By: PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

### I. Background and Standard of Review

Plaintiff, Clifford D. Skeen, ("Skeen"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that he was not eligible for supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 1381 *et seq.* (West 2012). Jurisdiction of this court is pursuant to 42 U.S.C. § 1383(c)(3). This case is before the undersigned magistrate judge upon transfer by consent of the parties pursuant to 28 U.S.C. § 636(c)(1).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the

case before a jury, then there is "substantial evidence.'"" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Skeen protectively filed his application for SSI on October 13, 2010, alleging disability as of January 1, 2004, due to back, neck and hearing problems, depression, anxiety and a learning disability. (Record, ("R."), at 213-16, 222, 227.) The claim was denied initially and on reconsideration. (R. at 112-14, 118-20, 123, 126-28, 130-32.) Skeen then requested a hearing before an administrative law judge, ("ALJ"). (R. at 133-34.) A video hearing was held on March 1, 2013, at which Skeen was represented by counsel. (R. at 31-54.)

By decision dated March 14, 2013, the ALJ denied Skeen's claim.[1] (R. at 11-26.) The ALJ found that Skeen had not engaged in substantial gainful activity since October 13, 2010, the date of Skeen's application. (R. at 13.) The ALJ determined that the medical evidence established that Skeen suffered from severe impairments, namely cervical spine degenerative disc disease with impingement, cord flattening and stenosis; hypertension; borderline intellectual functioning; and adjustment disorder, but he found that Skeen did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 13-14.) The ALJ found that Skeen had the residual functional capacity to perform sedentary work,[2] that did not require more

---

[1] Skeen previously filed applications for disability insurance benefits, ("DIB"), and SSI that ultimately resulted in an unfavorable decision on September 24, 2010. (R. at 58-70.) There is no indication that Skeen appealed this decision; thus, this court will review the record for the dates October 13, 2010, Skeen's application date, through March 14, 2013, the date of the ALJ's decision.

[2] Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking or standing is

than two hours of standing and/or walking in an eight-hour workday and six hours of sitting in an eight-hour workday; that did not require more than occasional stooping or crouching; that did not require more than frequent bilateral reaching, handling and feeling; that would require less than occasional overhead reaching with the left upper extremity; that required the performance of no more than simple, short instructions; that did not require public interaction, but allowed appropriate social contact with others in the workplace that involved brief superficial interaction; and allowed him the ability to hear conversation and speech within a normal occupational environment. (R. at 16.) The ALJ found that Skeen had no past relevant work. (R. at 24.) Based on Skeen's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that jobs existed in significant numbers in the national economy that Skeen could perform, including jobs as an addresser and a printed circuit board assembly worker. (R. at 25.) Thus, the ALJ found that Skeen was not under a disability as defined by the Act, and was not eligible for SSI benefits. (R. at 26.) *See* 20 C.F.R. § 416.920(g) (2015).

After the ALJ issued his decision, Skeen pursued his administrative appeals, (R. at 7), but the Appeals Council denied his request for review. (R. at 1-5.) Skeen then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 416.1481 (2015). The case is before this court on Skeen's motion for summary judgment filed May 11, 2015, and the Commissioner's motion for summary judgment filed July 15, 2015.

---

often necessary in carrying out job duties. Jobs are sedentary if walking or standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. § 416.967(a) (2015).

Skeen was born in 1963, (R. at 36, 213), which, at the time of the ALJ's decision, classified him as a "younger person" under 20 C.F.R. § 416.963(c).[3] Skeen has a high school education and vocational education training in masonry. (R. at 36, 227-28.) Skeen testified at his hearing that he had "some problems with hearing," but he did not need a hearing aid. (R. at 37.) He stated that he suffered from chronic neck and back pain. (R. at 38.) Skeen stated that his pain medication helped, but that he was never completely pain free. (R. at 38.) He stated that his depression medication helped "a little." (R. at 41.) Skeen stated that he could stand for up to one hour without interruption. (R. at 43.) He stated that he could walk a quarter of a mile without interruption. (R. at 43.) He stated that he like to read books for fun. (R. at 47.)

Mark Heilman, a vocational expert, also was present and testified at Skeen's hearing. (R. at 49-53.) Heilman stated that Skeen's last substantial gainful activity was in 1995 or 1996. (R. at 50.) Heilman was asked to consider a hypothetical individual of Skeen's age, education and no significant work background for 10 to 15 years who had the residual functional capacity to perform sedentary work that did not require more than occasional stooping or crouching; who could frequently reach, handle and feel bilaterally; who could less than occasionally reach overhead with his left upper extremity; who could understand, remember and carry out short, simple instructions; who could interact appropriately with others in the work environment where the tasks involve short, simple instructions; and whose hearing ability was sufficient to hear speech at a conversational level. (R. at 50-51.)

---

[3] At the time of the hearing and subsequent ALJ's decision, Skeen was just eight months shy of his 50th birthday. Once he attained 50 years of age, he became classified as a "person closely approaching advanced age" under 20 C.F.R. § 416.963(d).

Heilman identified jobs that existed in significant numbers at the sedentary, unskilled level that such an individual could perform, including jobs as a pharmaceutical packager, a call-out operator and a telephone information clerk. (R. at 51.)

Heilman was asked to consider the same hypothetical individual, but who would not be able to have much public contact or public interaction of any type and whose interactions with others in the work environment would be limited to occasional, brief and superficial interaction. (R. at 51-52.) Heilman stated that the jobs of a call-out operator and a telephone information clerk would be eliminated. (R. at 52.) However, he stated that the individual could perform the jobs of a printed circuit board touch-up screener and an addressing clerk. (R. at 52.) When asked to consider the same hypothetical individual, but who would be limited to occasional use of the left nondominant upper extremity, Heilman stated that all jobs previously identified, with the exception of the call-out operator, would be eliminated. (R. at 52.)

In rendering his decision, the ALJ reviewed records from Wise County Public Schools; Howard S. Leizer, Ph.D., a state agency psychologist; Dr. Bert Spetzler, M.D., a state agency physician; Dr. Joseph Duckwall, M.D., a state agency physician; Louis Perrott, Ph.D., a state agency psychologist; Appalachia Family Health Center; Kathleen Walker, Ph.D.; Robert S. Spangler, Ed.D., a licensed clinical psychologist; Dr. Kevin Blackwell, D.O.; B. Wayne Lanthorn, Ph.D., a licensed psychologist; and Mountain Home Veterans Administration Medical Center, ("VA"). Skeen's attorney also submitted a medical source

statement from Kathleen Walker, Ph.D., a licensed psychologist with the VA, to the Appeals Council.[4]

On December 2, 2008, B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, evaluated Skeen at the request of Disability Determination Services. (R. at 330-36.) The Wechsler Adult Intelligence Scale - Third Edition, ("WAIS-III"), was administered, and Skeen obtained a performance IQ score of 72, a verbal IQ score of 82 and a full-scale IQ score of 75. (R. at 330.) Skeen reported that he had not worked for the previous nine years because he could not find a job. (R. at 332.) Lanthorn diagnosed chronic pain disorder associated with psychological factors and general medical conditions; and borderline intellectual functioning. (R. at 335.) He assessed Skeen's then-current Global Assessment of Functioning, ("GAF"),[5] score at 61.[6] (R. at 335.) Lanthorn found that Skeen had excellent immediate memory and adequate short-term memory; he was capable of focusing his concentration and persisting at tasks "quite well;" and his communication skills were good. (R. at 336.)

On December 8, 2008, Dr. Kevin Blackwell, D.O., examined Skeen at the request of Disability Determination Services. (R. at 338-42.) He opined that Skeen

---

[4] Since the Appeals Council considered and incorporated this additional evidence into the record in reaching its decision, (R. at 1-5), this court also must take these new findings into account when determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.,* 953 F.2d 93, 96 (4th Cir. 1991).

[5] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[6] A GAF score of 61-70 indicates "some mild symptoms ... OR some difficulty in social, occupational, or school functioning ... but generally functioning pretty well ...." DSM-IV at 32.

had the residual functional capacity to perform medium work[7] that did not require crawling, climbing ladders or working around unprotected heights. (R. at 341.) Physical examination was unremarkable. (R. at 340.) He diagnosed depression, hearing loss by history and cervical and lumbar pain. (R. at 340.)

On June 23, 2010, Skeen was seen at Appalachia Family Health Center for a routine follow-up appointment. (R. at 347-49.) He stated that he had a history of tobacco dependence; however, he was not ready to quit. (R. at 347.) Examination was normal, including memory, mood, affect, judgment and insight. (R. at 348.) He was diagnosed with hypertension and tobacco dependence. (R. at 349.)

On November 5, 2010, Dr. Romulo Fajardo, M.D., a physician at the VA, saw Skeen to establish a primary care physician. (R. at 402-09.) Skeen reported neck pain that radiated into his left shoulder and arm with numbness that was aggravated by head movement. (R. at 402-03.) He also complained of feeling sad with no interest in doing things, crying spells and insomnia. (R. at 403.) Examination was unremarkable with the exception of mild tenderness at the cervical and lumbar spines. (R. at 404.) His sensory and motor skills were intact with no incoordination of movement. (R. at 404.) Dr. Fajardo noted that Skeen was able to read; he had normal attention span and memory; his vision and hearing were deemed fair; and he had limitations due to back and shoulder problems. (R. at 406.) Dr. Fajardo diagnosed chronic back pain, hypertension, depression, anxiety and tobacco use. (R. at 404.) Skeen was encouraged to engage in a program of physical activities and to quit tobacco. (R. at 406-07.) Skeen stated that he was not

_____

[7] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, he also can do sedentary and light work. *See* 20 C.F.R. § 416.967(c) (2015).

willing to quit smoking. (R. at 407.) Dr. Fajardo offered to refer Skeen to a weight loss program, but he declined. (R. at 407-08.) An MRI of Skeen's cervical spine, dated November 26, 2010, showed radiculopathy with cervical degenerative changes with spinal canal impingement and cord flattening with a superimposed central disc herniation; hypertrophy; posterior disc/spur complex with mild flattening of the spinal cord causing mild to moderate canal stenosis; central disc extrusion with mild to moderate hypertrophic facet arthrosis causing cord compression and spinal canal impingement with narrowing of the central canal; severe right foraminal impingement and moderate to severe left foraminal stenosis; disc protrusion; mild to moderate left facet arthrosis; moderate severe left foraminal stenosis; and mild to moderate right foraminal stenosis. (R. at 411-12.)

On November 10, 2010, Kathleen Walker, Ph.D., a psychologist at the VA, saw Skeen for his complaints of depression. (R. at 387-98.) Skeen stated that he had not worked since 2000 and that he could not find a job because of his learning disability. (R. at 390.) He stated that he had "some depressive symptoms" resulting from not being able to work steadily or to have a significant long-term relationship. (R. at 390.) Skeen reported that he was honorably discharged from the military.[8] (R. at 391.) He stated that he wanted to re-enlist, but, because he was unable to score sufficiently high enough on his re-enlistment test, he was not allowed to do so. (R. at 391.) Skeen denied previous psychiatric treatment or hospitalizations. (R. at 392.) Skeen's mental status was normal. (R. at 395.) He was alert and oriented; he was dressed appropriately with adequate hygiene and grooming; he established adequate rapport and maintained adequate eye contact; his gait was steady and

---

[8] Skeen reported that he was stationed in Germany as a truck driver in the Army from 1984 through 1987. (R. at 394.) He reported that he was not exposed to combat. (R. at 394.)

unassisted; he had regular rate and rhythm of speech; his mood was mildly dysphoric with a sad, but appropriate and congruent affect; his memory was grossly intact; his thoughts were logical, linear and goal-directed; he had adequate insight and judgment; his general fund of knowledge appeared below average; and his remote, recent and immediate recall was intact. (R. at 394-95.) Walker diagnosed an adjustment disorder with depressed mood; a learning disorder, not otherwise specified; and rule out borderline intellectual functioning. (R. at 387.) She assessed Skeen's then-current GAF, score at 50.[9] (R. at 387, 395.) Individual therapy was recommended, and Skeen declined. (R. at 396.)

On December 29, 2010, Dr. Scott C. Dulebohn, M.D., a neurosurgeon at the VA, noted that Skeen's MRI showed significant cervical stenosis at the C4-C6 disc spaces. (R. at 429.) Examination revealed a mild foot drop on the right, with poor heel walking noted. (R. at 429.) Skeen had a good ability to stand and squat, and his toe walking was excellent. (R. at 429.) Dr. Dulebohn recommended surgery to reduce the risk to Skeen's spinal cord. (R. at 429.) Skeen opted to "think about it." (R. at 429.)

On January 6, 2011, Skeen reported that his symptoms of depression had decreased since starting Bupropion. (R. at 425.) He reported that he had not experienced any verbal angry outburst or verbal agitation in "quite some time." (R. at 425.) Walker reported that Skeen's mental status remained stable. (R. at 425.) He was alert and oriented; he was dressed appropriately with adequate hygiene and grooming; he established adequate rapport and maintained adequate eye contact; his gait was steady and unassisted; he had regular rate and rhythm of speech; his

---

[9] A GAF score of 41-50 indicates that the individual has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning...." DSM-IV at 32.

mood was less dysphoric; his affect was appropriate and congruent; his memory was grossly intact; his thoughts were logical, linear and goal-directed; he had adequate insight and judgment; his general fund of knowledge appeared average; and his remote, recent and immediate recall was intact. (R. at 426.) Walker assessed Skeen's then-current GAF score at 55.[10] (R. at 427.)

On January 20, 2011, Dr. Fajardo saw Skeen for follow-up treatment for cervical spine stenosis. (R. at 422-25.) Surgical intervention was recommended, and Skeen opted to "think about it." (R. at 422.) He reported that his medications, Tramadol and naproxen, were not controlling his pain and requested stronger pain medication. (R. at 422.) On examination, Skeen had cervical spine tenderness with no swelling. (R. at 423.) He had no weakness, tremors or incoordination of movement. (R. at 423.)

On February 11, 2011, Skeen was seen at the VA for a comprehensive eye examination. (R. at 418-21.) He complained of blurred vision at distance. (R. at 419.) His uncorrected visual acuity was 20/50 in both eyes. (R. at 420.) On February 23, 2011, Dr. Dulebohn reported that examination revealed no evidence of myelopathy. (R. at 479.) Skeens reported that he did not want to proceed with surgery. (R. at 479.)

On May 9, 2011, Skeen reported that his medication continued to stabilize his depressed mood, and he denied depressive symptoms. (R. at 476.) Walker reported that Skeen's mental status remained stable. (R. at 476.) He was alert and oriented; he was dressed appropriately with adequate hygiene and grooming; he

---

[10] A GAF score of 51-60 indicates that the individual has "[m]oderate symptoms … OR moderate difficulty in social, occupational, or school functioning…." DSM-IV at 32.

established adequate rapport and maintained adequate eye contact; his gait was steady and unassisted; he had regular rate and rhythm of speech; his mood was euthymic with a broad, appropriate and congruent affect; his memory was grossly intact; his thoughts were logical, linear and goal-directed; he had adequate insight and judgment; his general fund of knowledge appeared average; and his remote, recent and immediate recall was intact. (R. at 476.) Walker assessed Skeen's then-current GAF score at 55. (R. at 478.)

On May 26, 2011, Skeen reported that he increased his hydrocodone to 7.5 mg every six hours to control his pain. (R. at 473.) On examination, Skeen had mild lumbar and cervical spine tenderness with no swelling. (R. at 473.) His extremities had no pedal edema or cyanosis. (R. at 473.) Skeen displayed no evidence of weakness; sensation was intact; he had no tremors; and no incoordination of movements. (R. at 474.)  Dr. Fajardo diagnosed chronic back pain; degenerative disc disease; hypertension; depression; anxiety; tobacco use; hyperlipidemia; and abnormal lipid fasting test. (R. at 474.) On October 28, 2011, Dr. Fajardo saw Skeen for complaints of chronic neck pain that radiated into his left arm with numbness of the fingers. (R. at 503.) Physical examination was normal with the exception of mild cervical spine tenderness. (R. at 504.)

On November 17, 2011, Skeen reported an increase in seasonal depressive symptoms. (R. at 498.) Walker noted that, despite his seasonal depression symptoms, his mental status remained stable. (R. at 498.) He was alert and oriented; he was dressed appropriately with adequate hygiene and grooming; he established adequate rapport and maintained adequate eye contact; his gait was steady and unassisted; he had regular rate and rhythm of speech; his mood was moderately dysphoric with a slightly constricted affect; his memory was grossly

intact; his thoughts were logical, linear and goal-directed; he had adequate insight and judgment; his general fund of knowledge appeared average; and his remote, recent and immediate recall was intact. (R. at 498-99.) Walker continued a diagnosis of adjustment disorder with depressed mood; and learning disorder, not otherwise specified. (R. at 496.) She assessed Skeen's then-current GAF score at 55. (R. at 496, 500.)

On May 17, 2012, Skeen reported that he was doing "all right" as far as his mental health was concerned. (R. at 529.) He denied any current depressive symptoms with the use of medication. (R. at 529.) Walker reported that Skeen's mental status was stable. (R. at 529.) He was alert and oriented; he was dressed appropriately with adequate hygiene and grooming; he established adequate rapport and maintained adequate eye contact; his gait was steady and unassisted; he had regular rate and rhythm of speech; his mood was euthymic; his affect was appropriate and congruent; his memory was grossly intact; his thoughts were logical, linear and goal-directed; he had adequate insight and judgment; his general fund of knowledge appeared average; and his remote, recent and immediate recall was intact. (R. at 529-30.) Walker assessed Skeen's then-current GAF score at 55. (R. at 531.)

On February 13, 2013, Skeen reported that he continued to struggle with his depressed mood because of his lack of financial resources. (R. at 539.) He stated that intellectually and socially he would be unable to work because of his chronic pain, which made him feel ill-tempered at times. (R. at 539.) Walker reported that Skeen's mental status was stable. (R. at 539.) He was alert and oriented; he was dressed appropriately with adequate hygiene and grooming; he established adequate rapport and maintained adequate eye contact; his gait was steady and

unassisted; he had regular rate and rhythm of speech; his mood was mildly dysphoric; his affect was mildly irritable at times and congruent; his memory was grossly intact; his thoughts were logical, linear and goal-directed; he had adequate insight and judgment; his general fund of knowledge appeared average; and his remote, recent and immediate recall was intact. (R. at 539.) Walker assessed Skeen's then-current GAF score at 55. (R. at 540.)

On March 14, 2013, Walker completed a mental assessment, indicating that Skeen had a limited, but satisfactory, ability to maintain personal appearance; to behave in an emotionally stable manner; and to relate predictably in social situations. (R. at 544-46.) She opined that Skeen had a seriously limited ability to follow work rules; to relate to co-workers; to deal with the public; to use judgment; to interact with supervisors; to deal with work stresses; to function independently; to maintain attention and concentration; to understand, remember and carry out complex, detailed and simple instructions; and to demonstrate reliability. (R. at 544-45.) She found that Skeen could manage his benefits. (R. at 546.) Walker found that Skeen would be absent from work more than two days a month due to his impairments. (R. at 546.)

On March 28, 2011, Dr. Bert Spetzler, M.D., a state agency physician, opined that Skeen could perform light work. (R. at 83-86.) He opined that Skeen's ability to push and/or pull with his upper extremities was limited. (R. at 84.) Dr. Spetzler opined that Skeen could occasionally climb ramps and stairs, stoop, kneel, crouch and crawl; frequently balance; and never climb ladders, ropes and scaffolds. (R. at 84.)  He found that Skeen's ability to reach in any direction with his left upper extremity was limited. (R. at 84.) Dr. Spetzler opined that Skeen should

avoid concentrated exposure to extreme cold, wetness, vibration and hazards. (R. at 85.)

On March 31, 2011, Howard S. Leizer, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), finding that Skeen suffered from an affective disorder, mental retardation and an anxiety-related disorder. (R. at 81-82.) He opined that Skeen was mildly restricted in his ability to perform his activities of daily living and in maintaining social functioning and moderately restricted in maintaining concentration, persistence or pace. (R. at 82.) Leizer opined that Skeen had not experienced repeated episodes of decompensation of extended duration. (R. at 82.)

That same day, Leizer completed a mental assessment indicating that Skeen had no significant limitations in his ability to remember locations and work-like procedures; to understand, remember and carry out very short and simple instructions; to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; to sustain an ordinary routine without special supervision; to work in coordination with or in proximity to others without being distracted by them; and to make simple work-related decisions. (R. at 86-87.) He found that Skeen had moderate limitations in his ability to understand, remember and carry out detailed instructions; to maintain attention and concentration for extended periods; and to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (R. at 86-87.)

On September 5, 2011, Louis Perrott, Ph.D., a state agency psychologist, completed a PRTF, finding that Skeen suffered from an affective disorder, mental retardation and an anxiety-related disorder. (R. at 98-99.) He opined that Skeen was mildly restricted in his ability to perform his activities of daily living and in maintaining social functioning. (R. at 99.) Perrott also found that Skeen was moderately restricted in his ability to maintain concentration, persistence or pace. (R. at 99.) He opined that Skeen had not experienced repeated episodes of decompensation of extended duration. (R. at 99.)

That same day, Perrott completed a mental assessment, indicating that Skeen had no significant limitations in his ability to remember locations and work-like procedures; to understand, remember and carry out very short and simple instructions; to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; to sustain an ordinary routine without special supervision; to work in coordination with or in proximity to others without being distracted by them; and to make simple work-related decisions. (R. at 103-04.) He found that Skeen had moderate limitations in his ability to understand, remember and carry out detailed instructions; to maintain attention and concentration for extended periods; and to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (R. at 103-04.)

On September 6, 2011, Dr. Joseph Duckwall, M.D., a state agency physician, opined that Skeen could perform light work. (R. at 100-03.) He opined that Skeen's ability to push and/or pull with his upper extremities was limited. (R. at 101.) Dr. Duckwall opined that Skeen could occasionally climb ramps and stairs,

stoop, kneel, crouch and crawl; frequently balance; and never climb ladders, ropes and scaffolds. (R. at 101.) He found that Skeen's ability to reach in any direction with his left upper extremity was limited. (R. at 102.) Dr. Duckwall opined that Skeen should avoid concentrated exposure to extreme cold, wetness, vibration and hazards. (R. at 102.)

On November 19, 2011, Robert S. Spangler, Ed.D., a licensed psychologist, evaluated Skeen at the request of Skeen's attorney. (R. at 481-88.) Spangler noted that Skeen was clean, neat and appropriately dressed. (R. at 481.) He reported that Skeen had "obvious hearing difficulties." (R. at 481.) Skeen had awkward gross motor movements and slow gait. (R. at 481.) Spangler reported that Skeen frequently needed instructions repeated, but demonstrated good concentration. (R. at 481.) Skeen was appropriately persistent on task; however, his pace was impacted due to the need to shift in his seat. (R. at 481.) Skeen was alert and oriented; he had adequate recall of remote events and recent events; he had fair eye contact; his motor activity was tense; his affect was congruent; and his mood was anxious and depressed. (R. at 482.) Spangler reported that Skeen's judgment and insight were consistent with borderline intelligence; his stream of thought was unremarkable; associations were logical; thought content was nonpsychotic; and his social skills were adequate. (R. at 483.) He reported that Skeen did not have the judgment or skills necessary to handle his financial affairs if awarded benefits. (R. at 483.) The Wechsler Adult Intelligence Scale - Fourth Edition, ("WAIS-IV"), was administered, and Skeen obtained a verbal comprehension index score of 83, a perceptual reasoning index score of 75, a working memory index score of 86 and a full-scale IQ score of 76. (R. at 484.) Spangler diagnosed depressive disorder, not otherwise specified, moderate; anxiety disorder, not otherwise specified, mild to

moderate; and borderline intelligence. (R. at 485.) He assessed Skeen's then-current GAF score at 55. (R. at 485.)

Spangler completed a mental assessment, indicating that Skeen had a limited, but satisfactory, ability to follow work rules and to maintain attention and concentration. (R. at 486-88.) He opined that Skeen had a seriously limited ability to relate to co-workers; to deal with the pubic; to use judgment; to interact with supervisors; to function independently; to understand, remember and carry out simple job instructions; to maintain personal appearance; to behave in an emotionally stable manner; and to relate predictably in social situations. (R. at 486-87.) Spangler found that Skeen had no useful ability to deal with work stresses; to understand, remember and carry out complex and detailed instructions; and to demonstrate reliability. (R. at 486-87.) He also opined that, due to his impairments, Skeen would be absent from work more than three days a month. (R. at 488.)

### III. Analysis

The Commissioner uses a five-step process in evaluating SSI claims. *See* 20 C.F.R. § 416.920 (2015); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 416.920(a) (2015).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2014); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

Skeen argues that the ALJ erred by improperly determining his residual functional capacity. (Plaintiff's Memorandum In Support Of Hi[s] Motion For Summary Judgment, ("Plaintiff's Brief"), at 5-7.) Skeen also argues that the ALJ erred by failing to find that his impairments met or equaled the criteria for the listing for disorders of the spine, found at 20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.04(A). (Plaintiff's Brief at 7-8.) He further argues that the ALJ erred by failing to find that he suffered from additional severe impairments as found by the previous ALJ's decision dated September 24, 2010. (Plaintiff's Brief at 8-9.) Finally, Skeen argues that the ALJ erred by posing a hypothetical question to the vocational expert that failed to fully incorporate his impairments. (Plaintiff's Brief at 9-10.) In particular, Skeen argues that the hypothetical question included a limitation of "not much public interaction," and the ALJ found that Skeen was limited to "no public interaction." (Plaintiff's Brief at 9-10.)

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute

its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 416.927(c), if he sufficiently explains his rationale and if the record supports his findings.

Skeen argues that the ALJ erred by posing a hypothetical question to the vocational expert that failed to fully incorporate his impairments. (Plaintiff's Brief at 9-10.) In particular, Skeen argues that the hypothetical question posed to the vocational expert included a limitation of "not much public interaction;" however, the ALJ found that Skeen was limited to "no public interaction." (Plaintiff's Brief at 9-10.) Based on my review of the record, I agree. The ALJ found that Skeen had the residual functional capacity to perform sedentary work, that did not require more than two hours of standing and/or walking in an eight-hour workday and six hours of sitting in an eight-hour workday; that did not require more than occasional stooping or crouching; that did not require more than frequent bilateral reaching,

handling and feeling; that would require less than occasional overhead reaching with the left upper extremity; that allowed for only simple, short instructions; that did not require public interaction, but allowed appropriate social contact with others in the workplace that involved brief superficial interaction; and that allowed him the ability to hear conversation and speech within a normal occupational environment. (R. at 16.)

The ALJ asked the vocational expert to consider a hypothetical individual who was limited to sedentary work that did not require more than occasional stooping or crouching; who could frequently reach, handle and feel bilaterally; who could less than occasionally reach overhead with his left upper extremity; who could understand, remember and carry out short, simple instructions; who could interact appropriately with others in the work environment where the tasks involve short, simple instructions; and whose hearing ability was sufficient to hear speech at a conversational level. (R. at 50-51.) The vocational expert identified jobs that such an individual could perform, including jobs as a pharmaceutical packager, a call-out operator and a telephone information clerk. (R. at 51.) When asked to consider the same hypothetical individual, but who would not be able to have a job that "*had much* public contact of any type, public interaction … of any type," he stated that the individual could perform the jobs of a pharmaceutical packager, in addition to jobs as a printed circuit board touch-up screener and an addressing clerk. (R. at 51-52.)

The ALJ found that Skeen could not perform a job that required any public interaction; however, it appears that the vocational expert identified jobs based on a hypothetical individual who would not be able to have a job that "had much" public contact. (R. at 16, 51.) Therefore, I cannot find that substantial evidence

exists to support the ALJ's finding that a significant number of jobs exist that Skeen could perform. Based on this finding, I will not address Skeen's remaining arguments.

An appropriate order and judgment will be entered remanding Skeen's claim to the Commissioner for further development.

DATED:     March 18, 2016.

/s/  *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE